# DELAWARE COUNTY HOUSING AUTHORITY, Appellant,

v.

## Barbara BISHOP.

Commonwealth Court of Pennsylvania.

Submitted on Briefs Jan. 14, 2000.

Decided Feb. 28, 2000.

Reargument Denied May 8, 2000.

---

2. We note that effective January 1, 1998, Alabama became a signatory of the Uniform Interstate Family Support Act.

Julie A. Auerbach, Media, for appellant.

No appearance entered for appellee.

Before DOYLE, President Judge, and FRIEDMAN, J., and MIRARCHI, Jr., Senior Judge.

FRIEDMAN, Judge.

The Delaware County Housing Authority (Authority) appeals from an order of the Court of Common Pleas of Delaware County (trial court) denying the Authority's post-trial motion and entering judgment in favor of Barbara Bishop (Bishop). The Authority had attempted to terminate Bishop's federally subsidized housing benefits due to the criminal activities of Bishop's sons who resided with her in her dwelling unit. For the following reasons, we affirm.

Since September of 1979, Bishop has resided at 536 Front Street, Upland, in the Upland Terrace Public Housing Development (Development), in Delaware County, pursuant to a lease with the Authority. (Trial court op. at 1; R.R. at 29a, 73a.) The lease identifies the occupants of the premises as Bishop and her two adult sons, Nathaniel Bishop and Ralph Walters. (Trial court op. at 1; R.R. at 73a.) Although his name was on Bishop's lease, Nathaniel Bishop did not reside at his mother's home; instead, he lived with his girlfriend at 1212 Holland Avenue. (Trial court op. at 1, 9; R.R. at 45a–46a.) However, on September 17, 1995, following a fight with his girlfriend, Nathaniel, who was then twenty-one years old, left his girlfriend's home to return to his mother's home in the Development. (Trial court op. at 1–2; R.R. at 45a, 53a.) Five days later, on September 22, 1995, Nathaniel robbed and raped a sixty-eight year old woman, also a resident of the Development, in her home. Bishop was away in Connecticut at the time. (Trial court op. at 1, 7, 9; R.R. at 53a, 54a, 100a.) Nathaniel subsequently was convicted of burglary, robbery, rape, unlawful restraint and theft by unlawful

taking or disposition; he was sentenced to serve a prison term of thirteen years and four months to thirty years. (Trial court op. at 1; R.R. at 8a, 107a.)

On October 5, 1995, as a result of the robbery/rape, the Upland Borough Police Department executed a search warrant on Bishop's home. The police found a small amount of cocaine and marijuana, which they determined to be in the exclusive control [1] of Bishop's older son, Ralph Walters, then thirty-two years old. (Trial court op. at 2, 7; R.R. at 13a–14a, 98a.) Ralph Walters pleaded guilty to drug possession and was placed into the Accelerated Rehabilitative Disposition Program. (Trial court op. at 2; R.R. at 8a, 99a.)

As a result of her sons' criminal activity, the Authority initiated proceedings to evict Bishop from her dwelling unit [2] for violating section 7L of her lease, which states that tenants are obliged:

> Not to engage in criminal activity, including drug-related criminal activity, on or near the public housing [p]remises, and to have the Tenant's guests, any family member or other person under the Tenant's control refrain from such activity.

(R.R. at 82a; trial court op. at 2.)

The Authority filed a complaint with the District Justice, who ruled against Bishop, and Bishop appealed. A panel of arbitrators in the trial court entered an award in favor of Bishop, and the Authority appealed from that award by filing, in the trial court, an action in ejectment for possession of the premises. (Trial court op. at 3; R.R. at 110a, 112a.)

Following a non-jury trial, the trial court entered judgment in favor of Bishop.

(Trial court op. at 3.) The Authority filed a motion for post-trial relief, seeking judgment in favor of the Authority or, in the alternative, a new trial. (R.R. at 162a.) The trial court denied the Authority's post-trial motion. In its supporting opinion, the trial court found that, in evicting Bishop, the Authority failed to consider the following mitigating factors: (1) Bishop lived peacefully in her home for nearly twenty years before her sons' criminal activity; (2) Bishop herself had not been involved in any criminal activity; (3) although her adult sons were involved in criminal activity while residing with Bishop, there was no evidence that they were under Bishop's control, as Bishop is not legally responsible for the acts of her twenty-one and thirty-two year-old sons; and (4) there was no evidence that Bishop was aware of her sons' criminal activity. (Trial court op. at 6–7.) Thus, the trial court determined that the Authority's eviction of Bishop was a "manifest and flagrant abuse of discretion or a purely arbitrary execution of [its] duties." (Trial court op. at 13.) The Authority's appeal to this court followed.

■ On appeal,[3] the Authority argues that Bishop's lease, as well as the Code of Federal Regulations, permit the eviction of Bishop for the criminal activity of her sons and that the trial court improperly substituted its discretion for that of the Authority in refusing to uphold Bishop's eviction. (Authority's brief at 3.)

In support of its argument, the Authority relies on the cases of *Allegheny County Housing Authority v. Liddell*, 722 A.2d 750 (Pa.Cmwlth.1998), and *Housing Authority of City of York v. Dickerson*, 715 A.2d 525 (Pa.Cmwlth.1998), *appeal denied*,

---

1. At the time the warrant was executed, Bishop was upstairs in her bedroom and not in the presence of her son. (Trial court op. at 8–9; R.R. at 12, 13, 47a.)

2. On October 13, 1995 and again on October 30, 1995, the Authority sent Bishop a notice of termination and a notice to quit the premises as a result of Nathaniel Bishop's criminal activity. (Trial court op. at 2; R.R. at 95a, 96a.) On November 14, 1995, the Authority sent Bishop a notice to quit the premises as a

result of Ralph Walter's criminal activity. (Trial court op. at 2; R.R. at 97a.)

3. Our scope of review is limited to determining whether necessary findings of fact are supported by substantial evidence, whether an error of law was committed or whether constitutional rights were violated. *Allegheny County Housing Authority v. Liddell*, 722 A.2d 750 (Pa.Cmwlth.1998).

560 Pa. 676, 742 A.2d 172 (1999). In *Liddell*, the Court of Common Pleas of Allegheny County refused to evict a tenant as a result of the drug conviction of the tenant's cousin, who temporarily resided with her while awaiting the availability of his own apartment. In *Dickerson*, the Court of Common Pleas of York County refused to evict a tenant whose minor grandson, who resided with the tenant, was arrested for robbery and burglary. In both cases, the common pleas courts concluded that the housing authorities abused their discretion by failing to consider all mitigating factors before deciding to terminate the tenants' leases. We reversed in each case, explaining that, although the Department of Housing and Urban Development's (HUD) regulation at 24 C.F.R. § 982.552(c)(1)(1995) **allowed** housing authorities to consider all circumstances of each case before deciding whether to terminate a lease as a result of criminal activity, that regulation did not **require** that they do so. Thus, we held that those housing authorities did not abuse their discretion in failing to consider mitigating circumstances prior to deciding to terminate the tenants' leases.

The Authority maintains that the trial court failed to follow *Liddell* and *Dickerson*, and, instead, improperly relied upon this court's earlier decision in *Housing Authority of the City of York v. Ismond*, 700 A.2d 559 (Pa.Cmwlth.1997), *aff'd*, 556 Pa. 436, 729 A.2d 70 (1999), in which we held that housing authorities must consider **all** mitigating circumstances before evicting a tenant for the criminal acts of another. The Authority correctly points out that our decision in *Ismond* was limited to the HUD regulation in force prior to

October 2, 1995.[4] The Authority also correctly points out that HUD amended that regulation, effective October 2, 1995, (*See* 60 Fed.Reg. 45,661 (1995)), and that under the amended regulation, the Authority is not required to consider mitigating factors prior to eviction. *See Dickerson, Liddell.*

In this regard, we note that Nathaniel's criminal conduct that, in part, formed the basis for the Authority's decision to evict Bishop, occurred on September 22, 1995, prior to the effective date of the amended regulation. Thus, because *Ismond* remains controlling with respect to Nathaniel's conduct, the Authority would have been required to consider mitigating factors, had Nathaniel been the only one to engage in criminal conduct. However, Bishop's other son, Ralph Walters, also engaged in criminal conduct, and that conduct occurred on October 5, 1995, three days **after** the effective date of the new regulation. Thus, Walters' criminal activity falls within the scope of the amended regulation, which permits the Authority discretion whether to consider mitigating factors. *See Liddell, Dickerson.*

Nevertheless, we cannot agree with the Authority that it has complete discretion[5] to evict a tenant under the circumstances presented here, where the tenant had no knowledge of the criminal activity and had no control over those who committed the offenses. Neither the lease nor the federal law on which it is premised imbues the Authority with such wide-ranging power.

■ We agree with the trial court that section 7L of Bishop's lease limits eviction to situations where a tenant has control over the person committing the criminal activity. That lease provision requires

---

4. 24 C.F.R. § 882.216(c)(2).

5. Where an administrative agency possesses discretionary power to take actions, courts may not reverse the agency's action absent an abuse of discretion. *Liddell.* In *Liddell*, we stated that we were limited to determining "whether there has been a manifest and flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions." *Id.* at 753 (quoting *Blumenschein v. Housing Auth. of Pittsburgh*, 379 Pa. 566, 573, 109

A.2d 331, 335 (1954)). However, our supreme court has held that there is no distinction between a manifest abuse of discretion and an abuse of discretion, explaining that "the use of the term 'manifest' in 'manifest abuse of discretion' has no legal significance and is, therefore, unnecessary to describe the applicable standard." *Jacobs v. Halloran*, 551 Pa. 350, 354 n. 5, 710 A.2d 1098, 1101 n. 5 (1998) (citations omitted).

that Bishop ensure that her guests, family members or other persons **under her control** refrain from engaging in criminal activity on or near the public housing premises. (R.R. at 82a; trial court op. at 2.) The trial court found that Bishop's two adult sons were **not under her control**; substantial evidence supports that finding.[6]

Because we cannot discern whether the phrase "under the Tenant's control" in section 7L of Bishop's lease modifies only the term "other person," or whether the phrase "under the Tenant's control" also modifies "guests" and/or "any family member," we must look to Congress' intent in directing housing authorities to insert such language in tenants' leases.

The United States Housing Act of 1937, *as amended,* 42 U.S.C. § 1437d(*l*)(5)(1995),[7] requires that all public housing authorities use leases which provide that any criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises by other tenants or any drug-related criminal activity on or near such premises, engaged in by a public housing tenant, any member of the tenant's household, or any guest or other person under the tenant's control, shall be cause for termination of the tenancy.

In *Charlotte Housing Authority v. Patterson,* 120 N.C.App. 552, 464 S.E.2d 68 (1995),[8] the Court of Appeals of North Carolina had occasion to interpret section 1437d(*l*)(5) in a case with facts similar to those of Bishop's case and concluded that a literal interpretation of section 1437d(*l*)(5) would yield absurd results and would contravene Congress' clearly expressed legislative intent that the law not "impose a type of strict liability whereby the tenant

**6.** The Authority argues that the evidence showed that "Bishop allowed criminal activity to take place in" her home and, thus, the trial court erred by finding that Bishop lacked knowledge of her sons' criminal conduct. (Authority's brief at 10.) We cannot agree. After carefully reviewing the evidence, we find nothing to indicate that Bishop was aware of her sons' criminal conduct; in fact, the evidence is to the contrary.

With respect to Bishop's knowledge of Nathaniel's criminal conduct, the Authority points to the fact that Bishop knew that her son had been in jail on a previous occasion. (Authority's brief at 10.) Bishop did acknowledge that Nathaniel had been in jail from March 20, 1995 to July 21, 1995 for a probation violation, (R.R. at 54a); however, there was no evidence that Nathaniel's probation revocation was the result of criminal conduct. In fact, Bishop testified that Nathaniel violated his probation by failing to report to his probation officer. (R.R. at 54a–55a.) The only evidence concerning the reason Nathaniel originally was placed on probation was that he was involved in a fight. However, the fight took place outside of Delaware County, and not on or near the public housing premises. (R.R. at 54a–55a, trial court op. at 9, 10.)

As to Ralph Walters, the Authority maintains that the affidavit of probable cause for his arrest indicates that the Criminal Investigations Division (CID) of the District Attorney's Office of Delaware County was conducting surveillance of Bishop's home based upon information from a confidential informant of drug activity in Bishop's home. (Authority's brief at 11.) The Authority then argues that, if the CID had information of drug activity in Bishop's home, clearly Bishop must have known that drugs were in her home. (Authority's brief at 11.) Again, we disagree. Even if the police were aware of drug activity by Bishop's son, it does not necessarily follow that Bishop must have been aware of that activity. Moreover, Walters' drug activity could not have been as extensive as the Authority claims inasmuch as Walters was accepted into the Accelerated Rehabilitative Disposition Program. Bishop testified at trial that she had no knowledge that Walters was involved with drugs, (R.R. at 48a–49a, 52a); nothing in the record undermines Bishop's testimony in that regard.

**7.** In 1996, Congress amended this section by substituting the phrase "on or off such premises" for the phrase "on or near such premises." *See* Pub.L. 104–120 § 9(a)(1). Because that amendment occurred subsequent to the events of this case, it has no effect here. Also, in 1998, Congress redesignated section 1437d(*l*)(5) as section 1437d(*l*)(6).

**8.** In *Charlotte Housing Authority,* the housing authority sought to evict a tenant as a result of the criminal conduct of her nineteen-year old son, who was arrested for murder, assault with a deadly weapon, discharging a firearm into an occupied dwelling and possession of a deadly weapon on the premises of the public housing authority.

is responsible for all criminal acts regardless of her knowledge or ability to control them." *Id.* at 557, 464 S.E.2d at 72. Instead, that court, relying on Congress' clearly expressed legislative intent, held that, under section 1437d(*l*)(5), "good cause for eviction does not exist when a public housing tenant is not personally at fault for a breach of the criminal activity termination provision of a public housing lease by a member of the tenant's household." *Id.* at 557–558, 464 S.E.2d at 72.

Because of the significance of the legislative history relied upon by that court, we set it out here:

> In its report accompanying the Cranston–Gonzalez National Affordable Housing Act, the 1990 amendment to 42 U.S.C. § 1437d(*l*)(5), the congressional committee stated:
>
> > The Committee bill would amend a provision of the U.S. Housing Act that was added by the Anti–Drug Abuse Act of 1988. **This provision makes criminal activity grounds for eviction of public housing tenants if that action is appropriate in light of all the facts and circumstances.** This language was limited to criminal activity on or near the public housing premises.
> >
> > This Section would make it clear that criminal activity, including drug related criminal activity, can be cause for eviction only if it adversely affects the health, safety, and quiet enjoyment of the premises. **The Committee anticipates that each case will be judged on its individual merits and will require the wise exercise of humane judgment by the [public housing authority] and the eviction court. For example, eviction would not be the appropriate course if the tenant had no knowledge of the criminal activities of his/her guests or had taken reasonable steps under the circumstances to prevent the activity.**

S. Rep. No. 316, 101st Cong., 2d Sess. 179 (1990), reprinted in 1990 U.S.C.C.A.N. 5763, 5941 (emphasis added). The 1990 amendments also addressed criminal activity as cause for termination of a tenant's Section 8 assistance (a federal subsidy provided to tenants in private housing). 42 U.S.C. § 1437f(d)(1)(B)(iii) (Supp.1993). The committee report similarly provided:

> Termination of tenancy.—The bill includes language to permit evictions from Section 8 Existing Housing for criminal activity, including drug related criminal activity. · It is based on a similar provision ·contained in the Anti–Drug Abuse Act of 1988 governing public housing leases.... **The committee assumes that if the tenant had no knowledge of the criminal activity or took reasonable steps to prevent it, then good cause to evict the innocent family members would not exit [sic].**

S.Rep. No. 316, 101st Cong., 2d Sess. 179 (1990), reprinted in 1990 U.S.C.C.A.N. 5763, 5889 (emphasis added).

*Charlotte Housing Authority,* 120 N.C.App. at 556–557, 464 S.E.2d at 71–72.[9] We agree with the reasoning of *Charlotte Housing Authority* and apply it here.

■ For the foregoing reasons, we refuse to hold a tenant strictly liable for unforeseeable criminal acts committed, without the tenant's knowledge, by family members who are not under the tenant's control. Here, because Bishop had no knowledge of her sons' criminal conduct, because her sons were not under her control, and because Bishop reasonably could not have foreseen her sons' criminal conduct, Bishop's eviction would be contrary to Congress' intent in enacting 42 U.S.C. § 1437d(*l*)(5). Accordingly, we affirm the order of the trial court.

---

**9.** *See also Housing Authority of the City of Jersey City v. Thomas,* 318 N.J.Super. 191, 723 A.2d 119 (1999) (holding that section 1437d(*l*)(5) cannot be read to require the eviction of a tenant whose adult son surreptitiously entered the tenant's apartment against her will and conducted illegal drug activities in her apartment).

## O R D E R

AND NOW, this 28th day of February, 2000, the order of the Court of Common Pleas of Delaware County, dated July 23, 1999, is hereby affirmed.